1

2

3

4                          **UNITED STATES DISTRICT COURT**
                               **DISTRICT OF NEVADA**
5

6

7  RICHARD M. CHUDACOFF, M.D.,        )      2:08-CV-863-ECR-RJJ
                                      )
8        Plaintiff,                   )
                                      )
9  vs.                                )      **ORDER**
                                      )
10                                    )
   UNIVERSITY MEDICAL CENTER OF       )
11 SOUTHERN NEVADA, a political       )
   subdivision of Clark County,       )
12 State of Nevada, COUNTY            )
   COMMISSIONERS BRUCE L. WOODBURY,   )
13 TOM COLLINS, CHIP MAXFIELD,        )
   LAWRENCE WEEKLY, CHRIS             )
14 GIUNCHIGLIANI, SUSAN BRAGER,       )
   AND RORY REID,                     )
15 KATHLEEN SILVER, an individual,    )
   THE MEDICAL AND DENTAL STAFF OF    )
16 THE UNIVERSITY MEDICAL CENTER OF   )
   SOUTHERN NEVADA, an independent    )
17 subdivision of University Medical  )
   Center of Southern Nevada, JOHN    )
18 ELLERTON, M.D., an individual,     )
   MARVIN J. BERNSTEIN, M.D., an      )
19 individual, DALE CARRISON, M.D.,   )
   an individual, DONALD ROBERTS,     )
20 M.D., an individual, DOE           )
   Defendants 1 through X, inclusive; )
21 and ROE Corporations, A through Z, )
   inclusive,                         )
22                                    )
         Defendants.                  )
23                                    )
                                      )
24 ─────────────────────────────────────)

25     This case arises out the suspension of a physician's medical

26 staff privileges with the University Medical Center of Southern

27 Nevada.  Two motions are presently pending before the Court.

28

1   First is the plaintiff's Motion for TRO and Preliminary
2   Injunction (#85), which was filed on January 9, 2009.  The Court
3   denied (#87) the motion (#85) to the extent that it sought a TRO and
4   stated that it would treat the motion (#85) solely as one for
5   preliminary injunction.  The defendants in this action fall into two
6   groups; one group of the defendants, but not the other, filed an
7   Opposition (#92) to the motion (#85) on January 26, 2009.  The
8   plaintiff filed a Reply (#99) on January 30, 2009.

9   Next is the plaintiff's Motion for Partial Summary Judgment
10  (#86), which the plaintiff also filed on January 9, 2009.  Again,
11  the first group of defendants filed an Opposition (#93) to the
12  motion on January 26, 2009.  This time, however, the other group of
13  defendants filed a joinder (#94) to the opposition (#93).  The
14  plaintiff filed a Reply (#97) on January 28, 2009.

15  The motions are ripe, and we now rule on them.

16

17  **I. Factual Background**

18  Plaintiff Dr. Richard Chudacoff (or "Chudacoff"), a physician
19  who specializes in the practice of Obstetrics and Gynecology, had
20  medical privileges to work at several local hospitals in the Las
21  Vegas area, including University Medical Center of Southern Nevada
22  (or "UMC").  (P.'s Second Amended Complaint ("SAC") ¶¶ 17, 18, & 24
23  (#82).)  In 2007, Chudacoff was appointed to the position of
24  Assistant Professor with the University of Nevada School of
25  Medicine, and on December 20, 2007, Chudacoff was granted staff
26  privileges at the University Medical Center of Southern Nevada in
27  the Obstetrics and Gynecology department.  (Id. ¶¶ 25, 26.)

28
2

Chudacoff worked at the UMC from December 20, 2007, through May 28, 2008.  (Id. ¶ 27.)  Part of Chudacoff's work involved overseeing resident physicians.  Chudacoff thought that the residents' skills were substantially below the skill level of other residents that he had supervised previously in his career at a different medical school.  (Id. ¶¶ 28, 29.)

To address these concerns, on April 16, 2008, Chudacoff wrote an email to Paul G. Stumpf, M.D., Professor and Chair of Obstetrics and Gynecology at the University of Nevada School of Medicine, regarding his "concerns over the skills of the obstetrical and gynecological residents at the University Medical Center of Southern Nevada."  (Id. ¶ 31.)  Chudacoff made several recommendations for improving the quality of care that the residents provided.  (Id.)

On May 28, 2008, Chudacoff received a letter from Defendant John Ellerton, M.D., Chief of Staff at the UMC, "in which Chudacoff was told that the Medical Executive Committee . . . had suspended, altered or modified his medical staff privileges."  (Id. ¶ 31.)  In addition, the Medical Executive Committee (or "MEC") had ordered Chudacoff to undergo drug testing and physical and mental examinations.  (Id.)  Chudacoff alleges that he had no knowledge that "the Medical Staff was considering altering or changing his privileges."  (Id. ¶ 32.)

Chudacoff also alleges that he was advised that he was entitled to a Fair Hearing in the May 28 letter; however, he was not advised of the allegations presented against him.  (Id. ¶ 39.)  On June 2, 2008, Chudacoff's insurance counsel requested a Fair Hearing.  (Id. ¶ 41.)  On June 10, 2008, Chudacoff received a letter from

3

University of Nevada-Reno President Milton Glick informing Chudacoff
that his employment with the University of Nevada School of Medicine
had been terminated as a result of the suspension of Chudacoff's
clinical privileges.  (Id. ¶ 43.)

On June 16, 2008, the UMC filed a report with the National
Practitioner Data Bank (or "NPDB") stating that Chudacoff's
privileges had been suspended indefinitely for substandard or
inadequate care and substandard or inadequate skill level.  (Id. ¶
44.)  The report to the National Practitioner Data Bank cites four
cases where Chudacoff caused "serious operative complications during
gynecological surgery," one incident where Chudacoff failed to
respond to a medical emergency, and numerous complaints of
disruptive behavior.  (Id. ¶ 45.)  On June 18 and 20, 2008,
Chudacoff was notified by different health care facilities that his
privileges had been denied or revoked because of the information
listed on the NPDB.  (Id. ¶¶ 46, 47.)  On June 23, 2008, Chudacoff
received the Medical Record numbers for the patients involved in the
NPDB report.  (Id. ¶ 48.)

Having received no response to his request for a Fair Hearing,
on July 2, 2008, Chudacoff filed the original complaint in this
case.  On July 18, 2008, Chudacoff was informed that his Fair
Hearing was scheduled for September 11, 2008.  Initial discovery
motions and notices of depositions were filed by the parties
throughout the summer.

While the litigation progressed, the Fair Hearing was held on
September 11, 2008.  Prior to the hearing, on September 5, 2008, the
MEC disclosed its list of witnesses for the Fair Hearing, but

4

Chudacoff received no information regarding the nature of the testimony that would be elicited from those witnesses.  Because of this delay, Chudacoff had to prepare his case for the MEC without having knowledge of the allegations against him.  Additionally, though Chudacoff's attorney was present at the September 11 hearing, his attorney was not allowed to present evidence, question witnesses, or participate in the hearing in any substantive way. (Id. ¶ 54.)

Aside from addressing the incidents of "substandard care," the Fair Hearing Committee seemed concerned with a discrepancy in Chudacoff's original medical staff application: Chudacoff reported never having an adverse action taken against him for his practice of medicine.  (Id. ¶ 58.)  In fact, he had a negative report during his time in the Navy, but that report was later revised by the District Court of the District of Columbia.  Chudacoff had not been informed that this topic would be addressed at the hearing.

On October 1, 2008, the Fair Hearing Committee set forth their findings and made recommendations regarding the MEC's sanctions. The Fair Hearing Committee disagreed with the suspension of Chudacoff's privileges and the requirement of direct supervision by another physician.  Instead, the committee recommended peer review of Chudacoff's practice.  The Fair Hearing Committee agreed with three of the MEC's sanctions: (1) placing Chudacoff on a "zero tolerance policy for disruptive behavior"; (2) requiring Chudacoff to discuss with the Nevada Health Professionals Foundation the necessity of undergoing physical and psychological evaluation; and (3) requiring Chudacoff to undergo drug testing.  The Fair Hearing

1  Committee also noted that the "concern about Dr. Chudacoff's
2  falsifying his medical staff application should be specifically
3  addressed to the MEC with appropriate action."

4      The Fair Hearing Committee's recommendations were forwarded to
5  the MEC for consideration at its next hearing, which was held on
6  October 28, 2008.  (Id. ¶ 57.)  At that hearing, at which Chudacoff
7  was present, the MEC reviewed and considered the Fair Hearing
8  Committee's recommendations.  The purpose of the hearing was to
9  address the Fair Hearing Committee's recommendations related to
10 Chudacoff's alleged incidents of substandard care.  Nevertheless, at
11 least one of the members of the MEC focused almost exclusively on
12 Chudacoff's alleged falsification of his medical staff application.
13 (Id. ¶ 57.)

14      Ten days after the MEC's hearing — November 7, 2008 — the MEC
15 notified Chudacoff of its decision.  The MEC adopted in part the
16 findings of the Fair Hearing Committee with respect to requiring
17 peer review of Chudacoff's practice.  (Id. ¶ 62.)  In addition, the
18 MEC issued a second letter suspending Chudacoff's privileges pending
19 revocation for "material misstatements of fact on [Chudacoff's]
20 medical staff application for privileges."  Each letter now
21 represents a separate action taken by the MEC.

22      Pursuant to the provisions of the Fair Hearing Plan, Chudacoff
23 had thirty days — or until December 7, 2008 — to appeal his
24 suspension relating to the misstatements on the application to a
25 Fair Hearing Committee, as that decision had not yet been presented
26 to the Fair Hearing process.  Once the MEC suspended Chudacoff's
27 privileges, the MEC had the obligation to report the suspension to
28

6

the National Practitioner Data Bank within fifteen days — or by November 22, 2008.  With respect to this potential report, the Court issued a preliminary injunction that prevented the defendants from reporting Chudacoff to the NPDB.

Chudacoff requested a Fair Hearing as to the suspension related to the alleged misstatements of fact on his medical staff application of his privileges.  On November 25, 2008, at 9:10 a.m., Chudacoff's attorney was informed that the MEC would meet at 12:30 p.m. that day to discuss the discrepancy in Chudacoff's application.  (Id. ¶ 65.)  Chudacoff presented his case; less than one hour later the MEC informed him that the MEC would proceed with the suspension of his privileges.  (Id. ¶ 68.)

Also on November 25, 2008, Chudacoff timely appealed the adoption of the Fair Hearing Committee's recommendations with respect to the substandard level of care issues to the Board of Trustees.[1]  At a session in early 2009, the Board appears to have sided with Chudacoff in a great number of respects.  As a result of the Board's actions, the MEC must now reconsider its initial decision to report Chudacoff to the NPDB for the substandard level of care issue.  The Board also mentioned that it may need to re-write the reporting policies to ensure that a physician is afforded sufficient procedural due process before being suspended.  In addition, the Board awarded Chudacoff $10,000 to pay for costs and fees associated with the dispute.  The MEC is yet to reconsider its actions.

---

[1]The members of the Clark County Board of Commissioners comprise the Board of Trustees.

7

## II. Procedural Background

Chudacoff originally filed suit (#1) on July 2, 2008, alleging claims of violation of due process under the Fourteenth Amendment and assorted state law claims.  Chudacoff seeks declaratory and injunctive relief, as well as money damages and attorney's fees.

All of the defendants — the University Medical Center, its Commissioners, several individual physicians and others who serve on administrative committees for the medical center, and every physician and dentist who holds staff privileges at the medical center — filed an Answer (#23) to the complaint on July 23, 2008. Chudacoff filed an amended complaint #46) on September 22, 2008; the defendants answered (#47) that complaint on October 2, 2008. Chudacoff filed a second amended complaint (#82) on January 6, 2009, to which the defendants filed answers (## 95, 96).  The second amended complaint varies from the original complaint in only minor areas and adds an additional cause of action under the United States Constitution.

The Court held a hearing on January 5, 2009, to consider pressing motions filed by both sides.  The defendants had filed an Emergency Motion (#48) to Dismiss or Alternatively to Stay the Instant Matter Pending Exhaustion of All Administrative Remedies and Proceedings.  Chudacoff had filed Emergency Motions (## 55, 57) for Temporary Restraining Order/Preliminary Injunction.  The defendants sought to dismiss the case on the basis of immunity under the Health Care Qualified Immunity Act (or "HCQIA").  We denied the defendants' motion, reasoning that it was inappropriate to resolve the HCQIA matter at the motion to dismiss stage, as the issue turned on

8

1  questions of fact.  We also granted Chudacoff's motion for
2  preliminary injunction and enjoined the defendants from reporting
3  any negative information regarding Chudacoff's suspension of medical
4  staff privileges as a result of his allegedly falsified application.

5      Chudacoff then sought an order requiring the defendants to
6  remove any negative information they had already reported with the
7  NPDB with respect to the alleged incidents of insufficient medical
8  care.  Chudacoff argues that because his due process rights were
9  violated, the defendants should be required to remove any negative
10 information they reported about him.  To this end, Chudacoff filed
11 his Emergency Motion (#85) for Temporary Restraining Order and
12 Preliminary Injunction ("P.'s Mtn. for TRO and PI") on January 9,
13 2009.  Only one group of the defendants — the medical and dental
14 staff of the UMC, John Ellerton, Marvin Bernstein, Dale Carrison,
15 and Donald Roberts — filed a response (#92) to the motion.  The
16 other defendants in the action — Bruce Woodbury, Tom Collins, Chip
17 Maxfield, Lawrence Weekly, Chris Giunchigliani, Susan Brager, the
18 UMC itself, Rory Reid, and Kathleen Silver — filed nothing in
19 response to the motion (#85).

20     Additionally, Chudacoff filed a Motion (#86) for Partial
21 Summary Judgment ("P.'s Mtn. for PSJ"), arguing no genuine issues of
22 material fact existed with respect to his claim that the defendants
23 had violated his due process rights.  The first group of defendants
24 filed a response (#93) to the motion, and this time, the second
25 group of defendants filed a Joinder (#94) to the response.

26
27
28

### III. Motion for Partial Summary Judgment

Chudacoff's motion for partial summary judgment is limited to whether the defendants violated his due process rights by suspending his hospital privileges — and then reporting that suspension to the NPDB — without notice or an opportunity to be heard. The only facts relevant here concern whether Chudacoff was denied procedural due process before the defendants reported him to the NPDB with respect to his allegedly substandard level of care. If we find that the defendants deprived Chudacoff of a protected interest without due process, then we must evaluate whether the defendants are entitled to immunity under the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. § 11101, et. seq.

#### A. Standard

Summary judgment allows courts to avoid unnecessary trials where no material factual dispute exists. <u>N.W. Motorcycle Ass'n v. United States Dep't of Agric.</u>, 18 F.3d 1468, 1471 (9th Cir. 1994). The court must view the evidence and the inferences arising therefrom in the light most favorable to the nonmoving party, <u>Baqdadi v. Nazar</u>, 84 F.3d 1194, 1197 (9th Cir. 1996), and should award summary judgment where no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law, FED. R. CIV. P. 56(c). Judgment as a matter of law is appropriate where there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party. FED. R. CIV. P. 50(a). Where reasonable minds could differ on the material facts at issue, however, summary judgment should not be granted. <u>Warren</u>

1 | v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied,

2 | 116 S.Ct. 1261 (1996).

3 |     The moving party bears the burden of informing the court of the

4 | basis for its motion, together with evidence demonstrating the

5 | absence of any genuine issue of material fact. Celotex Corp. v.

6 | Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met

7 | its burden, the party opposing the motion may not rest upon mere

8 | allegations or denials in the pleadings, but must set forth specific

9 | facts showing that there exists a genuine issue for trial. Anderson

10 | v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Although the

11 | parties may submit evidence in an inadmissible form - namely,

12 | depositions, admissions, interrogatory answers, and affidavits -

13 | only evidence which might be admissible at trial may be considered

14 | by a trial court in ruling on a motion for summary judgment. FED.

15 | R. CIV. P. 56(c); Beyene v. Coleman Security Services, Inc., 854

16 | F.2d 1179, 1181 (9th Cir. 1988).

17 |     In deciding whether to grant summary judgment, a court must

18 | take three necessary steps: (1) it must determine whether a fact is

19 | material; (2) it must determine whether there exists a genuine issue

20 | for the trier of fact, as determined by the documents submitted to

21 | the court; and (3) it must consider that evidence in light of the

22 | appropriate standard of proof. Anderson, 477 U.S. at 248. Summary

23 | Judgement is not proper if material factual issues exist for trial.

24 | B.C. v. Plumas Unified Sch. Dist., 192 F.3d 1260, 1264 (9th Cir.

25 | 1999). "As to materiality, only disputes over facts that might

26 | affect the outcome of the suit under the governing law will properly

27 | preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

28 |

1   Disputes over irrelevant or unnecessary facts should not be

2   considered.  Id.  Where there is a complete failure of proof on an

3   essential element of the nonmoving party's case, all other facts

4   become immaterial, and the moving party is entitled to judgment as a

5   matter of law.  Celotex, 477 U.S. at 323.  Summary judgment is not a

6   disfavored procedural shortcut, but rather an integral part of the

7   federal rules as a whole.  Id.

8

9        **B. Procedural Due Process**

10        The Fourteenth Amendment prevents states from depriving

11  individuals of protected liberty or property interests without

12  affording those individuals procedural due process.  Bd. of Regents

13  of State Colls. v. Roth, 408 U.S. 564, 569 (1972).  With procedural

14  due process claims, the deprivation of the protected interest "is

15  not itself unconstitutional; what is unconstitutional is the

16  deprivation of such an interest without due process of law."

17  Zinermon v. Burch, 494 U.S. 113, 125 (1990).  Before being deprived

18  of a protected interest, a person must be afforded some kind of

19  hearing, "except for extraordinary situations where some valid

20  government interest is at stake that justifies postponing the

21  hearing until after the event."  Boddie v. Conn., 401 U.S. 371, 379

22  (1971).  In evaluating procedural due process claims, the Court must

23  engage in a two-step inquiry: (1) we must ask whether the state has

24  interfered with a protected liberty or property interest; and (2) we

25  must determine whether the procedures "attendant upon that

26  deprivation were constitutionally sufficient."  Humphries v. County

27

28                                    12

of Los Angeles, 554 F.3d 1170, 1184-85 (9th Cir. 2009) (quoting Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989)).

### 1. Protected Property Interest

A protected liberty or property interest is one that is "recognized and protected by state law." Paul v. Davis, 424 U.S. 693, 710 (1976). For example, when a state issues drivers' licenses, which confer citizens the right to operate a vehicle in that state, the state may not withdraw that right without affording due process. Id. (citing Bell v. Burson, 402 U.S. 55, 535 (1971)).

Just as Nevada grants licenses to its drivers, so too does it grant licenses to qualified physicians to practice medicine. In Nevada, Chapter 630 of the Revised Statutes generally governs the licensing of physicians in the state. See NEV. REV. STAT. §§ 630.003-630.411; see also Moore v. Bd. of Trustees of Carson-Tahoe Hosp., 495 P.2d 605, 608 (Nev. 1972) (recognizing a "right . . . subject to . . . reasonable rules and regulations" to "enjoy medical staff privileges in a community hospital"). Further, the UMC's bylaws and regulations provide for extending privileges to physicians to practice at the hospital provided that certain requirements are met. (See Bylaws, Ex. A (#85-4); Credentialing Manual, Ex. B (#85-4); Fair Hearing Plan, Ex. L (#48-5).) A physician's medical staff privileges are thus a protected interest under Nevada state law.

Chudacoff was both a licensed physician in the state and he had medical staff privileges at the UMC. The defendants have attempted to revoke Chudacoff's privileges at the UMC. This protected

1  interest cannot be revoked without constitutionally sufficient
2  procedures.

3

4          **2. Whether the Procedures Were Constitutionally Sufficient**

5          Chudacoff argues that because he was not "summarily suspended,"
6  the defendants were required to follow the process for "routine
7  administrative" actions as set forth by the UMC Bylaws and its Fair
8  Hearing Plan.  (P.'s Mtn. for PSJ at 12 (#86).)  Chudacoff asserts
9  that the defendants did not follow these procedures and that their
10 course of action violated his due process rights.  The defendants
11 contend that they followed their Bylaws and that nothing more was
12 required.

13         The amount of process that is due is a "flexible concept that
14 varies with the particular situation."  <u>Zinermon</u>, 494 U.S. at 127.
15 The Court tests this concept by weighing several factors:

16              First, the private interest that will be
               affected by the official action; second, the risk of
17             an erroneous deprivation of such interest through the
               procedures used, and the probable value, if any, of
18             additional or substitute procedural safeguards; and
               finally, the Government's interest, including the
19             function involved and the fiscal and administrative
               burdens that the additional or substitute procedural
20             requirement would entail.
               <u>Mathews v. Eldridge</u>, 424 U.S. 319, 335 (1976).
21

22         The private interest at stake here is the ability to practice
23 medicine at a particular location.  The interest extends further,
24 however, in that a suspension of privileges at one hospital, when
25 reported to the NPDB, could limit a physician's ability to practice
26 anywhere in the country.  The amount of process must accord
27 sufficient respect for a professional's life and livelihood.

28
                                  14

1    Next, the risk of an erroneous deprivation is also significant,
2 as an improper suspension would have dramatic consequences for the
3 physician.  Aside from the physician's concerns, the NPDB only
4 serves as a reliable source of information if it receives accurate
5 reports; an erroneous report reduces the NPDB's utility.  As a
6 result, there are substantial benefits to having procedural
7 safeguards in place to protect both the physician and the NPDB from
8 erroneous or improper reporting.  Both are best served by having the
9 safeguards in place on the front-end of the decision-making process;
10 neither is served by remedial provisions.  Once the damage is done,
11 it is hard to undo.

12    Third, it is important for the state to have control over the
13 quality of care that its physicians provide.  Additionally, the
14 state has an interest in insuring that it can discipline malfeasance
15 without further burdening limited state resources.

16    Given the important interests outlined above, it simply cannot
17 be that, in a typical administrative action situation, a physician
18 may have his privileges revoked without ever having a chance to
19 refute or challenge the accusations leveled against him.  The MEC
20 met late in May 2008 to discuss allegations concerning Dr.
21 Chudacoff's level of care, allegations that Dr. Chudacoff did not
22 know were being leveled against him.  The MEC, under the guise of an
23 administrative action, suspended Dr. Chudacoff's medical staff
24 privileges.[2]  Without ever even knowing that his privileges were in

25 ──────────────

26    [2]It is not clear how the MEC was able to take an adverse action
at this early time; the MEC likely could only "recommend" taking a
27 certain course of action under the Fair Hearing Plan.  (See
Credentialing Manual, Ex. B at 78-79 (#85-4).)

28
                                    15

jeopardy, Chudacoff was informed of the loss of his privileges on May 28, 2008.  The NPDB was informed of the suspension on June 16, 2008, well before Dr. Chudacoff ever had an opportunity to be heard on the matter.  The fatal flaw here is that the defendants suspended Chudacoff's staff privileges before giving him any type of notice or opportunity to be heard with respect to that suspension. Chudacoff's due process rights were violated by the timing of the MEC's actions.[3]

### C. HCQIA Immunity

Under the HCQIA, Congress sought to remedy the national need to restrict incompetent physicians from moving from state to state through effective professional peer review.  See 42 U.S.C. § 11101(3).  To alleviate concerns of lawsuits with respect to peer review, Congress granted "limited immunity from suits for money damages to participants in professional peer review actions." Mathews v. Lancaster Gen. Hosp., 87 F.3d 624, 632 (3d Cir. 1996); Austin v. McNamara, 979 F.2d 728, 733 (9th Cir. 1992) ("HCQIA was designed both to provide for effective peer review and interstate monitoring of incompetent physicians and to grant qualified immunity from damages for those who participate in peer review activities.").

The defendants contend that Chudacoff's allegations stem from the actions taken by the MEC, through its peer review process, in response to patient safety concerns, and members of the staff who

---

[3]In light of our conclusion, we need not resolve whether his due process rights were also violated by any absence of a writing from Dr. Ellerton to the MEC, or when Dr. Chudacoff's counsel was not allowed to present his case at the hearing.

1   participated in the peer review process are thus protected under the
2   immunity provisions of the HCQIA.  Chudacoff responds that HCQIA
3   immunity is not a blanket grant of immunity, but is subject to
4   certain statutory requirements that were not met here.  Chudacoff's
5   chief argument is that the MEC suspended his license prior to
6   providing him with any procedural safeguards.  He notes that even
7   when he was allowed to present evidence at the Fair Hearing on
8   September 11, 2008, his suspension had already been reported to the
9   National Practitioner Data Bank.

10       Under the HCQIA, if a "professional review action," as defined
11  by the statute, meets certain due process and fairness requirements,
12  then the review participants "shall not be liable in damages . . .
13  with respect to the action."  42 U.S.C. § 11111.  The HCQIA creates
14  a rebuttable presumption of immunity, forcing the plaintiff to prove
15  that the defendants' actions did not comply with the relevant
16  standards.  42 U.S.C. § 11112(a) ("A professional review action
17  shall be presumed to have met the preceding standards necessary for
18  . . . [immunity from damages] unless the presumption is rebutted by
19  a preponderance of the evidence.").  This rebuttable presumption
20  "creates an unusual summary judgment standard" that can be stated as
21  follows: "Might a reasonable jury, viewing the facts in the best
22  light for [the plaintiff], conclude that he has shown, by a
23  preponderance of the evidence, that the defendants' actions are
24  outside the scope of § 11112(a)?"  Bryan v. James E. Holmes Reg'l
25  Med. Ctr., 33 F.3d 1318, 1333 (11th Cir. 1994) (quoting Austin, 979
26  F.2d at 734).  The plaintiff must overcome the presumption of
27  immunity by showing that the review process was not reasonable.  Id.
28

                                    17

Whereas qualified immunity under § 1983 is a question of law that provides immunity not merely from liability but from suit altogether, Mitchell v. Forsyth, 472 U.S. 511, 526 (1985), HCQIA immunity "is immunity from damages only," Singh v. Blue Cross/Blue Shield of Mass., Inc., 308 F.3d 25, 35 (1st Cir. 2002); Decker v. IHC Hosps., Inc., 982 F.2d 433, 436 (10th Cir. 1992) (holding that HCQIA immunity is "immunity from liability only," not immunity from suit). HCQIA immunity does not shield a defendant from injunctive relief. See 42 U.S.C. § 11111(a)(1).

For immunity to apply, the defendants must meet four requirements. Austin, 979 F.2d at 733. First, the defendants must comply with the fairness standards set forth in 42 U.S.C. § 11112(a). Id. Second, the defendants must provide adequate notice and a hearing as provided in 42 U.S.C. § 11112(b). Id. Third, the defendants must report the results of the review action to the appropriate authorities in compliance with 42 U.S.C. §§ 11131-34. Id. Fourth, the review action must have been commenced after the effective date of the HCQIA: November 14, 1986. Id. No one challenges the fourth criterion, so it need not detain us.

### 1. Fairness Elements of 42 U.S.C. § 11112(a)

The fairness standards set forth in 42 U.S.C. § 11112(a) have four sub-requirements. The section provides that a professional review action must be taken:

(1) in the reasonable belief that the action was in the furtherance of quality health care,
(2) after a reasonable effort to obtain the facts of the matter,

1
2
3
4
5
6
7
8

    (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
    (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).
     A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence.
42 U.S.C. § 11112(a).

9     The defendants likely had a reasonable belief that their
10 actions were taken in furtherance of quality health care.  The
11 "reasonable" standard is an objective test, not a subjective one.
12 Austin, 979 F.2d at 734.  Thus, the Court need not concern itself
13 with claims of animosity on the part of some of the defendants; even
14 if true, these claims would be irrelevant to an objective test.  Id.
15 The issue turns on whether the defendants could reasonably believe
16 that suspending Dr. Chudacoff for the quality of care he provided
17 furthers quality health care.  It is possible that the suspension
18 was to further quality health care at the UMC, as a hospital
19 reasonably would not want to extend privileges to a physician that
20 was not practicing medicine at an appropriate level.

21     Whether the defendants acted after a reasonable effort to
22 obtain the facts of the matter is a closer question.  The parties
23 dispute how much of an investigation Dr. Ellerton undertook before
24 referring the matter to the MEC.  Given the "unusual" summary
25 judgment standard with HCQIA immunity, a reasonable jury could
26 conclude that the defendants' actions were outside the scope the
27 HCQIA.  The matter remains an open question of fact.

28

19

1    Turning to the third element, as we concluded above, the notice
2    and hearing procedures afforded Dr. Chudacoff were constitutionally
3    insufficient.   The lack of a pre-deprivation hearing was
4    fundamentally unfair to Dr. Chudacoff.   Nevertheless, section
5    11112(b), discussed below, provides a safe harbor for adequate
6    notice and hearing under 42 U.S.C. § 11112(a)(3).   We will address
7    that issue below.

8    With respect to the fourth element, the parties disagree as to
9    whether the action was warranted, and the parties disagree about
10   whether the defendants engaged in "reasonable efforts" to obtain the
11   facts of the matter.   Again, this matter appears to be an open
12   question.

13   At bottom, to have immunity under the statute, the defendants
14   must meet all of the elements of 42 U.S.C. § 11112(a).   The
15   defendants have thus far failed to show that they provided Dr.
16   Chudacoff with reasonable notice and hearing procedures of the
17   adverse action against him.   Thus, if we find that the defendants do
18   not qualify for the safe harbor of 42 U.S.C. § 11112(b), then the
19   open questions of fact become non-material to the question of
20   summary judgment.   We turn now to that issue.

21

22   **2. Notice and Hearing Elements under § 11112(b)**

23   Section 11112(b) provides a safe harbor for notice and hearing
24   requirements.   In part, the section provides:

25   A health care entity is deemed to have met the
     adequate notice and hearing requirement of
26   subsection (a)(3) of this section with respect to a
     physician if the following conditions are met (or
27   are waived voluntarily by the physician):

28
                                20

(1) Notice of proposed action
The physician has been given notice stating--
    (A)  (i) that a professional review action has
        been proposed to be taken against the
        physician,
        (ii) reasons for the proposed action,
    (B)  (i) that the physician has the right to
        request a hearing on the proposed action,
        (ii) any time limit (of not less than 30
        days) within which to request such a
        hearing, and
    (C) a summary of the rights in the hearing
    under paragraph (3).
(2) Notice of hearing
If a hearing is requested on a timely basis under
paragraph (1)(B), the physician involved must be
given notice stating--
    (A) the place, time, and date, of the hearing,
    which date shall not be less than 30 days
    after the date of the notice, and
    (B) a list of the witnesses (if any) expected
    to testify at the hearing on behalf of the
    professional review body.
42 U.S.C. § 11112(b).

The timing of the notice is critical to understanding this
provision.  The statute begins by using the present perfect
progressive tense ("The physician has been given notice"),
indicating that the action began in the past, has continued into the
present, and may continue into the future.  Next, the statute
requires, again using the present progressive tense, that a
physician be given notice that a "professional review action has
been proposed to be taken."  The verb "proposed" indicates that
while the proposal of the review action has begun in the past, the
"review action" has not yet come to fruition.  Thus, for HCQIA
immunity to apply, the notice given to the physician must state that
a review action will come to be in the future.  Were it sufficient
for the defendants merely to give the plaintiff notice of the review
action after the fact, the statute would read as follows: "The

21

physician has been given notice stating that a professional review action has been taken against the physician." This interpretation omits the operative phrase "proposed to be," which clearly denotes when in the course of events the review action must take place. It is not sufficient for the physician to be told, after the fact, that a review action has been taken against him already. The defendants have not met the requirements of the safe harbor provision.

### 3. Reporting Requirements of 42 U.S.C. § 11131-34

The relevant reporting requirements of 42 U.S.C. §§ 11133-34 require health care entities to report to the Board of Medical Examiners any adverse action that "affects the clinical privileges of a physician for a period longer than 30 days" within a specified time — in essence, not more than sixty days. It does not appear that there was anything procedurally deficient with the way in which Defendants reported Plaintiff's suspension to the Board.

Nevertheless, because the defendants did not comply with the notice and hearing requirements of the statute, they are not entitled to HCQIA immunity.

### IV. Motion for Preliminary Injunction

Chudacoff has also a filed a motion for preliminary injunction (#85). Chudacoff seeks to require the defendants to withdraw the adverse information lodged with the NPDB with respect to Chudacoff's alleged substandard level of care.

Requiring the defendants to lift the NPDB report regarding Chudacoff's ability to practice medicine turns this motion into one

1  for a mandatory injunction.  While the normal purpose of an

2  injunction is to preserve the status quo before trial to preserve

3  the rights of the parties, a mandatory injunction requires a party

4  to perform a specific act to remedy allegedly harmful conduct.

5  Texas & N. R.R. v. Northside Belt Ry, 276 U.S. 475 (1928).  Courts

6  require a higher burden to be met in order to issue mandatory

7  injunctions, especially when the requested action would force the

8  non-moving party to go beyond simply maintaining the status quo.

9  Stanley v. Univ. of S. Cal., 13 F.3d 1313, 1319-1320 (9th Cir.

10  1994).

11       Chudacoff's requested injunction is rooted in the MEC's

12  decision to suspend his hospital privileges without procedural

13  safeguards.  That is, there are two parts to Chudacoff's underlying

14  claim: (1) he was denied procedural due process; and (2) the MEC

15  improperly suspended his privileges.

16       Regarding this first claim, we concluded above that Chudacoff

17  was denied his procedural due process rights.  Nevertheless, we have

18  not considered whether the MEC's decision was ultimately

19  substantively correct.  Nor need we venture down that path now.

20       Had Chudacoff been afforded the proper procedural due process,

21  he would have had notice and a hearing before the MEC suspended his

22  privileges.  The MEC, however, would still have had the authority to

23  recommend suspending Chudacoff's privileges had the appropriate

24  basis been laid.  After all of the administrative procedures had

25  been followed — as outlined in the Fair Hearing Plan, the Bylaws,

26  and the Credentialing Manual — then Chudacoff could still have lost

27  his privileges.  He could also have prevailed.

28

1    The remedy sought here would require the defendants to give

2 Chudacoff the appropriate procedural due process.  Whether or not we

3 require the UMC to pull the adverse report with the NPDB now, the

4 Court would remand the matter back to the MEC to decide the case as

5 if Chudacoff had never been reported to the NPDB in the first place.

6    It appears from the papers before the Court that the case

7 already is back before the MEC, just as the Court would have

8 ordered.  (See D.s' Opp. to Mtn. for TRO/PI at 6 ("The Board [of

9 Trustees] ordered the parties to conduct a new Fair Hearing on the

10 issues related to the May 27, 2008 actions by the MEC within the

11 next sixty (60) days." (#92).)[4]  Depending on how the substantive

12 administrative proceedings turn out, it will become clear what

13 further order, if any, the Court must issue.  At the present time,

14 it is premature to attempt to fashion any injunctive relief.

15    In short, the administrative process needs to run its course

16 before the Court issues any injunctive relief, as the matter may be

17 resolved without any additional Court action.  While Dr. Chudacoff's

18 procedural rights have been violated, it is too early to hazard a

19 guess as to whether his substantive rights have been so affected.

20

21                          **V. Conclusion**

22    Prior to being deprived of a protected property interest, Dr.

23 Chudacoff was entitled to notice and an opportunity to be heard.  He

24 was not afforded constitutionally sufficient procedural protections.

25 Partial summary judgment in his favor is appropriate.  Further, the

26 _____

27    [4]It is not clear what result, if any, the MEC reached, though the
   hearing should have been held by March 20, 2009.

28                               24

1  defendants are not entitled to HCQIA immunity because they did not

2  comply with the required statutory provisions.

3      Additionally, the administrative procedures need to run their

4  course before the Court may fashion any type of injunctive relief,

5  if appropriate.

6

7      **IT IS, THEREFORE, HEREBY ORDERED** that Plaintiff's Motion for

8  Partial Summary Judgment (#86) is GRANTED.

9      **IT IS FURTHER ORDERED** that Plaintiff's Motion for Preliminary

10 Injunction (#85) is DENIED.

11

12

13 DATED: April 8, 2009.

14                                _Edward C. Reed._
                                  _____
15                                UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28
                                       25