1
2
3
4
5
6                    **UNITED STATES DISTRICT COURT**

7                         **DISTRICT OF NEVADA**

8    RICHARD CHUDACOFF, M.D.,                )

9              Plaintiff,                     )        2:08-cv-00863-RCJ-GWF
                                              )
10        v.                                  )
                                              )
11   UNIVERSITY MEDICAL CENTER, *et al.*,     )            **ORDER**
                                              )
12            Defendants.                     )
                                              )
13   _____ )

14
15                              **BACKGROUND**

16        Plaintiff Richard Chudacoff, M.D. ("Plaintiff" or "Chudacoff") is a physician who was

17   appointed to the position of Assistant Professor with the University of Nevada School of

18   Medicine, and granted staff privileges at the University Medical Center of Southern Nevada

19   ("UMC") in the obstetrics and gynecology department.   Chudacoff was granted interim

20   privileges on December 20, 2007, and was granted full staff privileges in the obstetrics and

21   gynecology department on January 15, 2008.  (Ellerton Letter dated January 15, 2008, Ex. B

22   (#86-2).)

23        In May 2008, Defendant John Ellerton, M.D. ("Dr. Ellerton"), Chief of Staff, received a

24   verbal complaint from Defendant Donald Roberts, M.D. ("Dr. Roberts") expressing concerns

25   about surgical complications in Plaintiff's cases.  (Ellerton Dep. at 46-47, Ex. 1 (#50-4).)  As

26   a result, an investigation was initiated and overseen by Dr. Ellerton.  (*Id.* at 67.)  On May 13,

27   2008, Dr. Ellerton received an e-mail from a nurse complaining about Plaintiff's behavior

28   towards the nursing staff.  (*Id.* at 54-55.)  At a meeting on May 27, 2008, Dr. Ellerton presented

     the results of his investigation to the Medical Executive Committee ("MEC").  Plaintiff was not

notified prior to the May 27, 2008 MEC meeting of the complaints against him or the investigation.

On May 27, 2008, the MEC decided to (a) suspend Plaintiff's obstetrical privileges until Plaintiff satisfied certain requirements placed by the MEC; (b) forbid Plaintiff from performing any surgeries unless accompanied by Dr. Spirtos; (c) place Plaintiff on a zero tolerance policy for disruptive behavior; (d) require Plaintiff to engage in a discussion with the Nevada Health Professionals Foundation regarding the necessity of a physical and psychological evaluation; and (e) require Plaintiff to undergo drug testing. (Ellerton Letter dated May 28, 2008, Ex. A (#48-3).) Plaintiff was notified of the MEC's decision by a letter written by Dr. Ellerton. (*Id.*) The May 28, 2008 letter advised Plaintiff that he was entitled to a Fair Hearing pursuant to the Medical Staff Bylaws (the "Bylaws"). (*Id.*)

On June 10, 2008, Milton Glick, president of the University of Nevada, sent Plaintiff a letter notifying Plaintiff that his employment with the School of Medicine would be terminated as of July 11, 2008. (Glick Letter dated June 10, 2008, Ex. A (#110-2).) On June 16, 2008, Defendants filed an "Adverse Action Report" with the National Practitioner Data Bank ("NPDB") that stated that Plaintiff's clinical privileges had been suspended for substandard of inadequate care. (NPDB Report, Ex. C (#86-2).) These actions were taken before Plaintiff's Fair Hearing.

On September 11, 2008, Plaintiff's Fair Hearing was held. At the Fair Hearing, Plaintiff's counsel was not allowed to call, examine, or cross-examine witnesses or otherwise present the case, pursuant to the Bylaws. (Bylaws IV.C.1.d. Ex. L (#48-5).) Plaintiff presented his case personally. (Sept. 11, 2008 Fair Hearing Transcript (#71-4).) The Fair Hearing Committee found that the preponderance of the evidence indicated "periodic episodes of unprofessional behavior and a pattern of poor collegial interactions especially with certain nursing staff" which created "an uncomfortable and possibly hostile work environment." (Fair Hearing Letter to MEC dated Sep. 12, 2008, Ex. K (#48-5).) The Fair Hearing Committee was also concerned with Plaintiff's "reluctance to accept ultimate responsibility for surgical complications that occurred while he was the supervising attending surgeon operating with residents." (*Id.*) The Fair Hearing Committee noted that there was testimony both for and

2

against Plaintiff for the charges of being disruptive and for the charges of substandard care. (*Id.*) The Fair Hearing Committee found that because there was sufficient testimony and actual adverse outcomes, continued investigation and review of Plaintiff's medical practices was warranted. (*Id.*) However, because the evidence concerning a major safety issue, whether Plaintiff was in fact present during an emergency C-section involving a prolapsed cord, tended to favor his availability, the Fair Hearing Committee recommended that the MEC reverse its decision that Plaintiff's privileges be suspended. (*Id.*) Instead, the Fair Hearing Committee recommended focused peer review for a set number of cases such as a minimum of 200 deliveries and 300 gynecological surgeries. (*Id.*) The Fair Hearing Committee agreed with the MEC's requirements that Plaintiff be placed on a zero tolerance policy for disruptive behavior, that Plaintiff discuss the necessity of a physical and psychological evaluation, and that Plaintiff undergo drug testing. (*Id.*)

At the October 28, 2008 MEC meeting, the MEC suspended Plaintiff's clinical privileges "pending revocation for material misstatements of fact on your medical staff application for privileges." (Ellerton Letter dated Nov. 7, 2008, Ex. D (#57-4).) Charges concerning the alleged misstatements on the application had come up during the Fair Hearing held on September 11, 2008, but the Fair Hearing Committee ultimately found that it was inappropriate for the Fair Hearing Committee to make a decision on the issue as it had not been addressed by the MEC prior to the Fair Hearing. (Fair Hearing Committee Letter to the MEC dated Sep. 12, 2008, Ex. K (48-5).) The MEC sent two letters to Plaintiff on November 7, 2008. The first stated that the MEC accepted the recommendations of the Fair Hearing Committee concerning Plaintiff's privileges. (Ellerton Letter dated Nov. 7, 2008, Ex. D (#57-4).) The second notified Plaintiff of the suspension of his privileges for misstatements of facts on his staff application. (*Id.*)

Plaintiff asked the MEC for reconsideration of their decision to suspend his privileges based on material misstatements in his application. (Ex. D (#86-2).) Plaintiff and his counsel attended the MEC meeting held on November 25, 2008, and Plaintiff was notified after that meeting that the MEC denied his request for reconsideration. (Mendelbaum E-mail dated Nov.

1  25, 2008, Ex. F (#57-4).)

2       On December 9, 2008, Plaintiff sent a letter to Dr. Ellerton requesting an appeal.

3  (Chudacoff Letter dated Dec. 9, 2008, Ex. 50 (#432-3).)  The appellate review hearing by the

4  Board of Trustees occurred on January 20, 2009.  (Board of Trustees Hearing Transcript, Ex.

5  52 (#432-3).)  The Board of County Commissioners ("BCC" or "Board") sat as UMC's Board

6  of Trustees.  Plaintiff's counsel was allowed to present the case at the hearing conducted by

7  the Board of Trustees.  (*Id.*) The Board of Trustees decided to send the matter back to a newly

8  reconstituted committee for a rehearing, and encouraged the parties to engage in settlement

9  discussions.  (*Id.* at 113.)

10       On January 22, 2009, Plaintiff sent the Commissioners Reid, Sisolak, Collins, Brown,

11  Weekly, Giunchigliani, and Brager a letter requesting reconsideration of the Board's decision.

12  (Chudacoff Letter dated Jan. 22, 2009, Ex. 53 (#432-3).)  Plaintiff expressed his concerns with

13  the Fair Hearing process, and claimed that the hospital and administration were not

14  participating in any settlement discussions.  (*Id.*)

15       Another Fair Hearing was scheduled for March 5, 2009.  (Mandelbaum Letter dated

16  Mar. 3, 2009, Ex. 55 (#432-3).)  On March 13, 2009, after meetings held on March 5, 8, and

17  12, 2009, the hearing committee recommended administrative restrictions on Plaintiff related

18  to his ability to teach and/or supervise residents.  (Christensen Letter dated Mar. 13, 2009, Ex.

19  59 (#432-3).)  The hearing committee's letter outlined the evidence presented at the hearing,

20  which included evidence related to four surgical complications, two instances of poor clinical

21  judgment, disruptive behavior, and witness testimony concerning national complication rates.

22  (*Id.*)  The hearing committee also recommended removing or modifying the NPDB entry

23  concerning inadequate skill, and recommended focused review as well as a zero tolerance

24  policy for future disruptive behavior.  (*Id.*)  At the April 28, 2009 MEC meeting, the MEC

25  accepted the report of the Fair Hearing Committee of March 5, 8, and 12, 2009, and limited

26  Plaintiff's obstetrical privileges to cases that do not involve resident supervision, required

27  formal training in resident supervision in order to resume resident supervision in obstetrics,

28  required 100% focused review on Plaintiff's next 100 gynecologic surgical cases, instituted a

zero tolerance policy for further disruptive behavior, required continuing medical education about disruptive behavior, appointed an onsite workplace monitor, and decided to remove the NPDB entry concerning substandard of inadequate skill level.  (Ellerton Letter dated May 7, 2009, Ex. 62 (#432-4).)

On July 21, 2009, the Board of Trustees conducted a review of the March 2009 Fair Hearing and subsequent MEC action.  (Minutes, Ex. 89 (#432-6).)  The Board of Trustees affirmed the MEC's actions on April 28, 2009.  (*Id.*)

On August 10, 2009, new information was reported to the NPDB reinstating clinical privileges, but noting that the committee agreed that concerns with surgical care and behavior were justified.  (NPDB Report, Ex. 92 (#432-6).)

On July 2, 2009, the Fair Hearing Committee conducted a hearing on the MEC recommendation to suspend Plaintiff's privileges pending revocation for material misstatements of fact on his application for privileges.  (Fair Hearing Committee Letter dated July 16, 2009, Ex. 84 (#432-6).)  The Fair Hearing Committee found that while certain misstatements were included in the application which might have led to a denial of staff membership had the misstatements not been made, the suspension of Plaintiff's privileges should be lifted and a formal letter of reprimand should be issued.  (*Id.*)  The MEC voted to uphold the decision of the Fair Hearing Committee, and Plaintiff's suspension of privileges due to material misstatements on his application for privileges was lifted.  (Ballard Letter dated Aug. 14, 2009, Ex. 94 (#432-6).)  Because the Bylaws provide no appellate review rights for a formal letter of reprimand, Plaintiff was unable to appeal that decision to the Board of Trustees.  (*Id.*)

### B. Procedural Background

On July 2, 2008, Chudacoff filed the original complaint in this case.  While the administrative process was ongoing, this Court granted partial summary judgment in favor of Chudacoff (#109), holding that Chudacoff was denied constitutionally sufficient procedural protections before being deprived of a protected property interest.  Ultimately, however, we granted summary judgment in favor of Defendants (#229), finding, *inter alia*, that the individual

doctor Defendants were not acting under color of state law and thus could not be liable under § 1983.  We dismissed the state law claim against UMC and the Board of Trustees of UMC ("the Commissioners") because we did not elect to exercise supplemental jurisdiction after dismissal of the federal claim.  The case was appealed to the Court of Appeals for the Ninth Circuit, and the Ninth Circuit reversed our determination that the individual doctor Defendants John Ellerton ("Ellerton"), Dale Carrison ("Carrison"), Marvin Bernstein ("Bernstein"), and Donald Roberts ("Roberts"), members of the MEC, are not state actors.

On August 28, 2009, before we granted summary judgment (#229) in favor of Defendants, Chudacoff filed a second action ("*Chudacoff II*") in this district against doctors who participated in the second and third administrative hearings held subsequent to the filing of the present action.  (2:09-cv-01679-RCJ-RJJ.)

On July 6, 2012, the Court granted (#493) Plaintiff leave to file a fifth amended complaint to add additional voting members of the MEC who had not previously been included as defendants to the action.  The Court granted leave to amend because Plaintiff claimed that the identities of these parties had been purposefully hidden from Plaintiff.  The Court also granted sanctions to Plaintiff for Defendants' failure to remove the NPDB entry, although the Court found that the failure was due to mistake rather than malice.  The sanctions to be granted were fees associated with bringing the Motion for Sanctions (#356), with the possibility of additional sanctions.

## MOTIONS TO DISMISS (##510, 545)

### A. Legal Standard

Courts engage in a two-step analysis in ruling on a motion to dismiss. *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  First, courts accept only non-conclusory allegations as true. *Iqbal*, 129 S. Ct. at 1949.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).  Federal Rule of Civil Procedure 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*  Federal Rule of Civil Procedure 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more

than conclusions." *Id.* at 1950.  The Court must draw all reasonable inferences in favor of the plaintiff. *See Mohamed v. Jeppesen Dataplan, Inc.*, 579 F.3d 943, 949 (9th Cir. 2009).

After accepting as true all non-conclusory allegations and drawing all reasonable inferences in favor of the plaintiff, the Court must then determine whether the complaint "states a plausible claim for relief." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949 (citing *Twombly*, 550 U.S. at 556).  This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*  A complaint that "pleads facts that are 'merely consistent with' a defendant's liability...'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

**B. Discussion**

On July 6, 2012, Plaintiff filed a Fifth Amended Complaint, four years after the initial complaint was filed on July 2, 2008, adding fifteen (15) doctors that served on the MEC (the "Newly Added Doctor Defendants") in 2008.  Plaintiff was granted leave to add these defendants after filing a motion stating that the identity of these defendants had been hidden and unknown to Plaintiff until this time.

The Newly Added Doctor Defendants request that the claims against them be dismissed as untimely.  Nevada's statute of limitations for personal injury claims is two years.  Nev. Rev. Stat. § 11.190(4)(e).  Section 1983 claims are governed by the forum state's statute of limitations for personal injury actions. *Knox v. Davis*, 260 F.3d 1009, 1012-13 (9th Cir. 2001).  "A claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Id.* at 1013 (quoting *TwoRivers v. Lewis*, 174 F.3d 987, 992 (9th Cir. 1999)).

Plaintiff claimed, in his request to add the Newly Added Doctor Defendants, that he had only recently become aware of their identities and involvement in the acts which form the basis of this case.  Specifically, Plaintiff stated that he attempted to discover the identities of the

1
2
3
4
5

Newly Added Doctor Defendants in 2008 and 2009, but the information was withheld under the "peer review privilege" which this Court held does not apply.  Discovery was reopened, and Plaintiff sought to add the Newly Added Doctor Defendants after receiving the MEC minutes from May 27, 2008.  The Court granted leave to add the Newly Added Doctor Defendants because of the alleged late disclosure of their identities.

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

However, contrary to Plaintiff's assertion, the Newly Added Doctor Defendants claim that Plaintiff knew the identities of the doctors serving on the MEC by 2008.  As support for their argument, the Newly Added Doctor Defendants refer to documents provided during discovery.  Defendants argue that the names of all of the doctors serving on the MEC were included in the initial disclosures as witnesses by September 9, 2008.  (Reply, Ex. A. Initial Disclosures (#521-1).) The Court cannot consider this evidence without converting the motions to dismiss to motions for summary judgment. Some of the evidence provided by Defendants is attached only to the reply briefs, and Plaintiff has not been given an opportunity to respond or to provide counter-evidence of his own.  For that reason, the Motions to Dismiss shall be denied with respect to the argument concerning timeliness, but Defendants shall be permitted to file a motion for summary judgment arguing that Plaintiff requested leave to amend to add additional defendants on a false basis. If Defendants show that Plaintiff knew of the identities of the Newly Added Doctor Defendants as members of the MEC as early as 2008, the Court may find that Plaintiff did not exercise reasonable diligence in bringing the claims against the Newly Added Doctor Defendants, and that Plaintiff misled the Court in his request to amend the complaint for the fifth time in 2012 to add defendants who had allegedly hitherto been unknown to Plaintiff.  Additional arguments concerning absolute immunity are addressed below in a separate section, but any remaining arguments for dismissal should be contained in the motion for summary judgment to be filed by Newly Added Doctor Defendants if necessary.

25

### SUMMARY JUDGMENT LEGAL STANDARD

26
27
28

Summary judgment allows courts to avoid unnecessary trials where no material factual dispute exists.  *N.W. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  The court must view the evidence and the inferences arising therefrom in the light most

8

favorable to the nonmoving party, *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996), and should award summary judgment where no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Judgment as a matter of law is appropriate where there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party. FED. R. CIV. P. 50(a). Where reasonable minds could differ on the material facts at issue, however, summary judgment should not be granted. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied*, 516 U.S. 1171(1996).

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Although the parties may submit evidence in an inadmissible form — namely, depositions, admissions, interrogatory answers, and affidavits — only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment. FED. R. CIV. P. 56(c); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988).

In deciding whether to grant summary judgment, a court must take three necessary steps: (1) it must determine whether a fact is material; (2) it must determine whether there exists a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) it must consider that evidence in light of the appropriate standard of proof. *Anderson*, 477 U.S. at 248. Summary judgment is not proper if material factual issues exist for trial. *B.C. v. Plumas Unified Sch. Dist.*, 192 F.3d 1260, 1264 (9th Cir. 1999). "As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputes over irrelevant or unnecessary facts should not be considered. *Id.* Where there is a complete failure of proof on an essential element of the nonmoving party's case, all other

facts become immaterial, and the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.  Summary judgment is not a disfavored procedural shortcut, but rather an integral part of the federal rules as a whole.  *Id.*

## ABSOLUTE IMMUNITY (##478, 510)

Defendants filed a "Motion for Summary Judgment on All Claims Pursuant to New Ninth Circuit Court of Appeals Opinion" (#478).  The Motion (#478) seeks summary judgment on all claims on the basis that Defendants are entitled to absolute immunity.  While this motion was filed prior to the filing of the fifth amended complaint, the issue remains central in the case, and the Court shall consider the arguments concerning absolute immunity contained in the Motion (#478) as well as in the Motions to Dismiss (#510, 545).

### A. Timeliness

While the deadline for dispositive motions was March 22, 2012, Defendants request leave to submit the Motion (#478) because of the Ninth Circuit Court of Appeal's ruling in *Buckwalter v. State of Nevada Bd. of Med. Exam'rs*, 678 F.3d 737 (9th Cir. 2012), which was issued on April 26, 2012.  Plaintiff argues that *Buckwalter* is merely an extension of *Mishler v. Clift*, 191 F.3d 998, 1007 (9th Cir. 1999), and therefore cannot serve as the basis for an untimely motion for summary judgment.  In *Buckwalter*, the Ninth Circuit extended absolute immunity to a board of medical examiners that summarily suspended a physician's medical license, whereas in *Mishler*, the Ninth Circuit dealt with a disciplinary hearing rather than a summary suspension.

Arguably, the proceedings in which Plaintiff's privileges were suspended are more like that in *Buckwalter* rather than *Mishler*.  For that reason, we find that extending the deadline for dispositive motions is not unreasonable, and shall consider this motion on its merits.  In addition, an amended complaint has since been filed, and the Newly Added Doctor Defendants' Motion to Dismiss (#510) also requests dismissal on the basis of absolute immunity.

### B. The Availability of Absolute Immunity to Defendants

Plaintiff argues that absolute immunity is not available to Defendants because

*Buckwalter* and *Mishler* involved a branch of the executive government, "where the instant case involves private actors who expressly disavowed any relationship to the executive branch." (Pl's Opp. at 15 (#479).)  While Defendants did argue that they are not state actors and did not seek absolute immunity, Plaintiff appealed our decision finding that Defendants are not state actors.  The Ninth Circuit found that Defendants, although private physicians not employed by the county hospital, were state actors because their authority to deprive Plaintiff of his staff privileges "flows directly from the UMC, whose authority to regulate physician privileges at a county hospital is in turn directly authorized by Nevada law." *Chudacoff v. Univ. Med. Ctr. of Southern Nevada*, 649 F.3d 1143, 1150 (9th Cir. 2011).  The Ninth Circuit found that the actions of Defendants "as governing members of the Medical Staff are therefore fairly attributable to the state, and they cannot now escape liability for their direct and personal participation in Chudacoff's unlawful suspension of staff privileges by claiming private conduct." *Id.* at 1150-51.

Absolute immunity attaches when:

> State and federal executive officials . . . perform "'special functions' which, because of their similarity to functions that would have been immune when Congress enacted § 1983, deserve absolute protection from damages liability."

*Buckwalter*, 678 F.3d at 740 (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 268-69 (1993)). "It is the 'nature of the function performed, not the identity of the actor who performed it,' that determines whether an official is cloaked by absolute immunity." *Id.*  Absolute immunity is accorded to officials of government agencies performing functions analogous to those of a prosecutor or a judge. *Id.*

Cases granting absolute immunity generally involve members of the executive branch. However, in light of the Ninth Circuit's ruling that the defendants in our case acted as state actors and may therefore be liable under § 1983, we find that Defendants may also be eligible for absolute immunity from such suits if other factors for absolute immunity are met.  While the safeguards typically available in cases involving the state board of medical examiners, such as the Nevada Administrative Procedures Act, do not apply, there are other possibly equivalent safeguards built into the actions of our defendants, and we see no reason to artificially

distinguish our defendants from state actors when evaluating their right to quasi-judicial immunity, while subjecting them to liability under section 1983 as state actors.

### C. The Butz Factors

In *Mishler v. Clift*, the Ninth Circuit held that six nonexclusive factors should be analyzed in deciding whether absolute immunity should be granted. *Mishler*, 191 F.3d 998, 1003 (9th Cir. 1999). Those factors, originally articulated in *Butz v. Economou*, 438 U.S. 478, 512-13 (1978), include:

> (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

*Mishler*, 191 F.3d at 1003; *see also Buckwalter*, 678 F.3d at 740. The Ninth Circuit found that the board members of the Nevada Board of Medical Examiners are entitled to absolute immunity for acts occurring during the disciplinary hearing process: holding hearings, taking evidence, and adjudicating. *Mishler*, 191 F.3d at 1008. In the more recent case, *Buckwalter*, the Ninth Circuit extended absolute immunity to board members of the Nevada Board of Medical Examiners for the summary suspension of a physician's medical license in a nonadversarial and ex parte proceeding without notice or an opportunity to be heard. 678 F.3d at 742. The Court specifically noted that such proceedings are "not subject to the various procedural strictures that govern formal disciplinary hearings" and still accorded absolute immunity to the board members. *Id.*

The *Buckwalter* court extended *Mishler* to summary suspension proceedings in part because "state law provides that whenever the Board Members exercise their summary suspension power, a formal hearing ineluctably follows." *Id.* at 743. While the summary suspension proceeding itself lacked the safeguards of notice or opportunity to be heard, it is accompanied by the following administrative hearing "with a full complement of procedural safeguards." *Id.* As Plaintiff points out, the Nevada Administrative Procedure Act does not govern the appeals process in our case; however, the Board is governed by the Bylaws, which provide for extensive appellate review, including notice and an opportunity to be heard,

12

1    following a decision or recommendation of the MEC.

2          Before, however, we consider the six *Butz* factors in greater detail, we considered

3    whether Defendants' actions in this case are more analogous to the summary suspension in

4    *Buckwalter*, or should be considered a routine administrative action, which Plaintiff argues

5    would defeat absolute immunity.  Defendants argue that regardless of what label is placed on

6    the actions, the facts of this case are identical to those found in *Buckwalter*, because the

7    MEC's decision to suspend Plaintiff's privileges without notice or opportunity to be heard was

8    based on their decision that he was a threat to the safety of patients.  Previously, at a

9    deposition, Dr. Ellerton testified that the MEC's actions were not undertaken pursuant to their

10   summary suspension power, but amounted to a routine administrative action, testimony that

11   was repeated in one of our previous Orders, and also quoted by the Ninth Circuit.  The Bylaws

12   separate an emergency summary suspension power from routine administrative actions by

13   giving the summary suspension power to the Chief of Staff.  Such a suspension is not to

14   exceed thirty (30) days or until the next MEC meeting.  The MEC, on the other hand, may

15   recommend suspending a physician's privileges as part of a routine administrative action after

16   an investigation.

17         We agree with Defendants that regardless of what label is placed on the summary

18   suspension, the facts of this case are more similar to the facts of *Buckwalter* than the facts of

19   *Mishler*.  As in *Buckwalter*, the MEC suspended Plaintiff's privileges after receiving complaints

20   about Plaintiff's quality of care.  The suspension was decided upon by the MEC after a

21   preliminary investigation.  The MEC decided to suspend Plaintiff's privileges at a hearing held

22   on May 27, 2008, without giving Plaintiff notice or an opportunity to be heard.  Plaintiff received

23   a letter the day after the MEC hearing, and was informed that he was entitled to a Fair Hearing

24   regarding the MEC decision.  The letter informed Plaintiff that the limitation of his privileges

25   were taken as a result of concern for patient safety, as four of Plaintiff's cases had surgical

26   complications in an approximate four-month time period.  In essence, at least, what occurred

27   was a summary suspension very much like the one described in *Buckwalter*, which the Ninth

28   Circuit described as a procedure in which the plaintiff "received no notice of the emergency ex

parte telephone conference . . . [and] had no opportunity to contest the charge that he was a danger to the public" before his privileges were suspended, with only a post-deprivation hearing set four months after the summary suspension. *Buckwalter*, 678 F.3d at 742.

Whether the MEC's decision is characterized as summary suspension or routine administrative action, there were procedural defects. It is clear that the MEC decision was not a summary suspension as defined in the Bylaws, because it proceeded after an investigation and an MEC meeting as provided for under the procedure for routine administrative actions rather than through emergency unilateral action by the Chief of Staff. In addition, under the Bylaws, a summary suspension is not to exceed thirty (30) days. A summary suspension as defined in the Bylaws would not have qualified Dr. Ellerton for absolute immunity under *Buckwalter* because the process is more akin to the summary suspension power for which the Second Circuit rejected absolute immunity. *See Buckwalter*, 678 F.3d at 745; *DiBlasio v. Novello*, 344 F.3d 292, 299 (2d. Cir 2003). The Ninth Circuit noted that the New York statutory scheme governing summary suspensions gives "virtually unfettered" power to the Commissioner of the State Department of Health to unilaterally suspend a physician's license following an investigation by the State Board of Professional Medical Conduct. *Buckwalter*, 678 F.3d at 745. What actually occurred in our case, the summary suspension of Plaintiff's privileges without notice or an opportunity to be heard, after a preliminary investigation and a hearing at which evidence was presented to the members, deliberated over, and voted upon, is similar to what occurred in *Buckwalter*. Dr. Ellerton did not exercise his summary suspension powers under the Bylaws unilaterally.

When the MEC engages in routine administrative actions against a physician whose conduct may be detrimental to patient safety or to the delivery of quality patient care, the MEC is governed by the procedure provided in the Credentialing Procedures Manual, Article VI. (Credentialing Procedures Manual, Ex. 5 at 27 (#432-1).)   The Credentialing Procedures Manual provides that the MEC may conduct an investigation concerning requests for administrative action, and that the MEC may recommend suspension of a physician's privileges as a result of such investigation. An MEC recommendation for decreased privileges

1   entitles a physician to the procedural rights contained in the Fair Hearing Plan.  While the MEC

2   suspended Plaintiff's privileges without notice or an opportunity to be heard, that action must

3   have been carried out under the routine administrative action authority of the MEC, and the

4   Court shall consider the routine administrative action procedure provided in the Bylaws and

5   the Credentialing Procedures Manual to decide the issue of absolute immunity.

6        We previously determined that Defendants violated Plaintiff's constitutional rights in

7   failing to provide notice and an opportunity to be heard before limiting his privileges.  That

8   decision is not fatal to a determination that Defendants are nevertheless entitled to absolute

9   immunity.  Defendants are immune from suits concerning procedural errors, even constitutional

10  errors, if absolute immunity applies.  *See, e.g.*, *Guzman-Rivera v. Lucena-Zabala*, 642 F.3d 92,

11  98-99 (1st Cir. 2011).  In *Guzman-Rivera*, the First Circuit held that the defendants are entitled

12  to absolute immunity despite the "grave and unacceptable" procedural error involved in the

13  summary suspension of the plaintiff's license.  *Id.*  "A judge is absolutely immune from liability

14  for his judicial acts even if his exercise of authority is flawed by the commission of grave

15  procedural errors."  *Id.* at 99 (quoting *Stump v. Sparkman*, 435 U.S. 349, 359 (1978)).  In

16  *Mishler*, the plaintiff argued that the actual practice of the board and its construction of the

17  rules must be considered in determining whether adequate procedural safeguards exist rather

18  than the Nevada statutes governing the disciplinary process.  *Mishler*, 191 F.3d at 1006.

19  However, the Ninth Circuit found that "[t]he acts of the Nevada Board are no less judicial or

20  prosecutorial because they may have been committed in error."  *Id.*  "It is the available

21  procedures, not the manner in which they are exercised in a particular case, that is the critical

22  inquiry for determining whether there are safeguards that reduce the need for private damages

23  actions."  *Id.*  Therefore, we believe that Defendants are entitled to an examination of whether

24  absolute immunity applies despite any procedural errors that may have occurred.

25       Furthermore, notice and an opportunity to be heard are not required prior to

26  investigating a complaint.  In *Mishler*, the Ninth Circuit noted that the Nevada Administrative

27  Procedure Act provides adequate safeguards to physicians when notice and an opportunity

28  to be heard at a formal hearing are given to a physician after the Nevada Board investigates

1   and decides to proceed with disciplinary action. *Mishler*, 191 F.3d at 1006 n.6. UMC's Fair
2   Hearing Plan similarly grants procedural safeguards of notice and an opportunity to be heard
3   once an adverse recommendation or action is taken pursuant to the Bylaws and the MEC's
4   power to conduct routine administrative action. (Fair Hearing Plan, Ex. 3 at 3 (#432-1).) For
5   that reason, the Bylaws may be sufficiently protective of a physician's rights, even if the MEC
6   acted in error by converting a recommendation to suspend privileges into immediate action
7   before Plaintiff was given an opportunity to contest the charges.

8   Even if the MEC erred procedurally, absolute immunity is still available to Defendants
9   if they had jurisdiction over the subject matter. *See id.* (quoting *Stump*, 435 U.S. at 356). The
10  MEC may, as part of a routine administrative action, investigate complaints and issue
11  recommendations limiting physician privileges. In our case, the MEC's recommendation was
12  put immediately into effect, and a fair hearing followed. Arguably, the MEC may not have had
13  the authority to limit Plaintiff's privileges when it did, but the Bylaws do not address when an
14  MEC recommendation becomes a decision, or how. During a deposition, Dr. Ellerton
15  represented that the understanding is that the MEC's recommendation is tantamount to a
16  decision. While we are not sure that is the intent of the Bylaws, the Bylaws are unclear on the
17  matter. It may be that the MEC recommends and the Chief of Staff converts the
18  recommendation into action. Regardless, in this case, the MEC voted to suspend Plaintiff's
19  privileges, and the suspension was put into effect immediately, and Plaintiff was given notice
20  and an opportunity to be heard in accordance with the Fair Hearing Plan.

21  In analyzing the *Butz* factors, we relied primarily on *Buckwalter*, *Mishler*, and *Moore v.*
22  *Gunnison Valley Hospital*, 310 F.3d 1315 (10th Cir. 2002). *Moore* examines the summary
23  suspension power of a public hospital's peer review committee. 310 F.3d at 1316. The Tenth
24  Circuit denied members of the committee absolute immunity because it found that only the first
25  *Butz* factor, the need to assure that the individual can perform his functions without
26  harassment or intimidation, favors absolute immunity. *Id.* at 1317.

27  <u>1. Need to Ensure Performance of Functions Without Harassment.</u>

28  This factor clearly favors absolute immunity. The MEC has the authority to recommend

16

or possibly take action to limit a practitioner's privileges as a disciplinary measure.  There is a "strong need" to ensure that such disciplinary functions can be carried out without the threat of harassment or intimidation "[i]n view of the public interest of ensuring quality health care." *Mishler*, 191 F.3d at 1005.  That need becomes more acute under emergency summary suspension circumstances.  In *Buckwalter*, the Ninth Circuit noted that the board members' "interest in performing their functions free from harassment is at its apex when a physician poses a serious threat to public safety."  *Buckwalter*, 678 F.3d at 743.

2. Safeguards that Reduce the Need for Private Damages Actions.

While Defendants are treated as state actors for the purposes of a § 1983 suit, they are not required to provide identical procedural safeguards as the Nevada State Board of Medical Examiners.  In *Mishler* and in *Buckwalter*, the state board is governed by Nevada statutes and the Nevada Administrative Procedure Act, whereas Defendants here were governed by UMC's Bylaws.  *See Mishler*, 191 F.3d at 1005-06; *Buckwalter*, 678 F.3d at 743.

The Nevada procedure for disciplinary hearings as it existed at the time of *Mishler* is described in detail by the Ninth Circuit.  *Mishler*, 191 F.3d at 1005, n. 6.  After the Nevada Board receives a complaint, an investigative committee reviews and investigates the complaint, and presents its evaluation and recommendation to the state board, which decides whether further action should be taken.  NEV. REV. STAT. §§ 630.11, 233B.122; *Mishler*, 191 F.3d at 1005, n.6.  If the board decides to proceed with disciplinary action, it must bring charges against the physician and set a formal hearing.  NEV. REV. STAT. § 630.339; *Mishler*, 191 F.3d at 1005, n.6.  The physician must receive notice of the charges, the hearing, and potential sanctions.  NEV. REV. STAT. § 630.339; *Mishler*, 191 F.3d at 1005, n. 6.  The physician is entitled to representation by counsel and can present evidence.  NEV. REV. STAT. § 233B.121; *Mishler*, 191 F.3d at 1005, n. 6.  If by clear and convincing evidence, the board determines that a violation of the regulations has occurred, it issues a written order containing findings and sanctions. NEV. REV. STAT. § 233B.121; *Mishler*, 191 F.3d at 1005, n. 6.  Any person aggrieved by a final order of the board is entitled to judicial review in district court.  NEV. REV. STAT. § 630.356; *Mishler*, 191 F.3d at 1005, n. 6.

17

In contrast, the emergency summary suspension process examined in *Buckwalter* is nonadversarial, often ex parte, employs an indeterminate burden of proof, and is "not subject to the various procedural strictures that govern formal disciplinary hearings." *Buckwalter*, 678 F.3d at 742. The Board is required to institute a formal hearing after a summary suspension. *Id.* Current Nevada law requires a hearing within 45 days of the entry of a summary suspension order, but at the time of *Buckwalter*, the only requirement was that the hearing be "promptly instituted." *Id.*

In spite of the "parsimony of the procedural safeguards built into the summary suspension procedure," the Ninth Circuit found that the summary suspension power is analogous to a judicial function. *Id.* The Ninth Circuit observed that once the board members exercise their summary suspension power, "a formal hearing ineluctably follows." *Id.* at 743. "The Board Members' temporary emergency judgment is thus necessarily tested in the crucible of an administrative hearing with a full complement of procedural safeguards." *Id.* The Ninth Circuit found that the post-deprivation hearing would suffice for a physician to "receive[] precisely the due process that the physician in *Mishler* did." *Id.* In contrast, the Tenth Circuit found that post-deprivation procedures may be inadequate to satisfy the second *Butz* factor. The Tenth Circuit rejected the peer review committee's argument that summary suspension is a temporary action reserved for emergency situations which only become permanent following more substantive proceedings, stating that "because Appellee has alleged damages from both his temporary suspension and the admonitions, Appellants must show the necessity for this abbreviated emergency process" and have failed to identify those circumstances. *Moore*, 310 F.3d at 1317-18.

The procedural safeguards under UMC's Bylaws are not identical to those found in Nevada law and applicable to the State Board of Medical Examiners. Nevertheless, if the Bylaws provided similar protection for a physician, the MEC may be eligible for absolute

18

immunity.[1] Under the Bylaws, the Chief of Staff or his designated representative may summarily suspend the privileges or membership status of a practitioner for a period not to exceed thirty days or until the next regularly scheduled MEC meeting when such action is required "to protect the life of any patient(s) or to reduce the substantial likelihood of injury or damage to the health or safety of any patient, employee, or other person present in the hospital." (Bylaws, Ex. 4 at 38 (#432-1).)  The practitioner must be given prompt special notice and the MEC may recommend modifications, continuation or termination of the terms of the suspension at its meeting to follow.  (*Id.*)  The practitioner is also entitled to the procedural rights of the Fair Hearing Plan, discussed below.  (*Id.*)

A routine administrative action is accompanied by additional procedural safeguards for a practitioner.  When a physician acts unprofessionally in a way that is or is likely to be detrimental to patient safety or to the delivery of quality patient care, administrative action may be taken by the chief of any department or any member of the Medical and Dental Staff, or by the Chief of Staff.  (Bylaws, Ex. 4 at 38 (#432-1).)  A written request for administrative action must be submitted to the MEC, and after deliberation, the MEC may act on the request or direct that investigation be undertaken.  (Credentialing Procedures Manual, Ex. 5 at 27 (#432-1).)  Within sixty days after receipt of the request for administrative action, and as soon as practicable after conclusion of the investigative process, if any, the MEC may act by recommending rejection of the request for action, recommending a warning or formal letter of reprimand, recommending a probationary period, recommending suspension of membership prerogatives or reduction, suspension, revocation of clinical privileges, and other such acts. (*Id.* at 27-28.)  An MEC recommendation for individual consultation, decreased privileges, reduced category, diminished or suspended patient care prerogatives, or suspended or revoked membership is deemed adverse and entitles the practitioner to the procedural rights contained in the Fair Hearing Plan. (*Id.* at 28.)

---

[1] We note, however, that the Bylaws allow appellate review only in the case of an adverse action, and the issuance of a reprimand letter is not considered an adverse action. (Bylaws, Ex. 4 at 40 (#432-1).)  In *Moore*, the Tenth Circuit found that the lack of appealability for a reprimand letter fails the sixth *Butz* factor.

19

Under the Fair Hearing Plan, if a physician requests a fair hearing within thirty days of an adverse recommendation or action, the Chief of Staff will appoint an ad hoc hearing committee composed of five members of the active Medical and Dental Staff, none of whom are members of the MEC, and if possible, none of whom are in "direct economic competition" with the practitioner. (Fair Hearing Plan, Ex. 6 at 4 (#432-1).) The practitioner is entitled to a copy of all medical records or documents to be presented at the hearing, a written report from each expert setting forth the substance of the expert's testimony, and copies of all materials provided by UMC for review by each expert. (*Id.* at 4-5.) Both sides may call and examine witnesses, introduce exhibits, cross-examine witnesses, be represented by a licensed attorney, and to submit a written statement at the close of the hearing. (*Id.* at 6.) However, a licensed attorney may not call, examine, or cross-examine witnesses or otherwise present the case. (*Id.*) The burden of proof is on the MEC, and the practitioner may support his contention that the adverse action lacks a basis by a preponderance of the evidence. (*Id.*) After the fair hearing, the committee makes a written report of its findings and forwards the report to the MEC or the body whose adverse action occasioned the hearing. (*Id.* at 7.) While the MEC is not bound to the findings of the fair hearing committee, it must review, consider, and affirm, modify, or reverse its original action at the next meeting. (*Id.*) The practitioner is entitled to a second appellate procedure entitled "Appellate Review" if the result is unsatisfactory after the fair hearing. (*Id.* at 8.) After a request for appellate review, the Board of Trustees shall schedule and arrange for an appellate review not less than thirty days nor more than sixty days from the date of the request, "provided, however, that an appellate review for a Practitioner who is under a suspension then in effect shall be held as soon as the arrangements for it may be reasonably made." (*Id.* at 7-8.) The Board of Trustees' decision is final. (*Id.* at 10.)

In our view, the Bylaws set out a process similar enough to the ones set forth in *Mishler* and *Buckwalter* for purposes of absolute immunity. While it is true that the actual acts of the MEC in our case do not fall clearly under either summary suspension or routine administrative action, it is the Bylaws that govern the MEC, rather than the actual practice of the MEC and its construction of the rules that we must consider in determining whether adequate procedural

safeguards exist.  *See Mishler*, 191 F.3d at 1006.  "It is the available procedures, not the manner in which they are exercised in a particular case, that is the critical inquiry for determining whether there are safeguards that reduce the need for private damages actions." *Id.*  The MEC investigated complaints based on patient safety, and provided Plaintiff with notice and an opportunity to be heard once disciplinary action was recommended, and the availability of the procedural safeguards found under the Fair Hearing Plan favors granting absolute immunity.[2]

### 3. Insulation from Political Influence

The Tenth Circuit in *Moore* found that peer review committees are more susceptible to political influence because the members work at the same hospital as the physician challenging their decisions and are his competitors in a small medical community.  *Moore*, 310 F.3d at 1318.  The Ninth Circuit held that the State Board of Medical Examiners, while not as independent as the federal administrative hearing officers in *Butz*, are "sufficiently insulated from political influence."  *Mishler*, 191 F.3d at 1007.  The Nevada Board members who participate in the disciplinary hearings work with the members who lodged the charge, and therefore there is not as much separation of the investigatory, prosecutorial and judging functions as there would be when separate state agencies perform separate functions.  *Id.* at 1006.  Six of the nine board members are doctors who practice medicine in Nevada, and this "raises the specter that board members may achieve personal financial gain by revoking the

---

[2] The summary suspension power under the Bylaws, however, does not pass muster under *Buckwalter*.  The Chief of Staff has the unilateral authority to summarily suspend privileges.  In *DiBlasio v. Novello*, the Second Circuit denied absolute immunity to employees of the New York State Department of Health who summarily suspended a physician's license. *DiBlasio v. Novello*, 344 F.3d 292, 300 (2d Cir. 2003).  The Ninth Circuit distinguished *DiBlasio* because under the statutory scheme at issue in that case, an "autarchic commissioner-figure may impose summary suspensions by fiat," and the commissioner was not required to adopt the hearing committee's recommendations, thereby rendering prompt post-deprivation hearings "hollow." *Buckwalter*, 678 F.3d at 745.  The Bylaws provide a process for summary suspensions that is more similar to that of *DiBlasio*.  However, in this case, the MEC proceeded on a routine administrative action basis.  The MEC convened and investigated the complaint, recommended suspension of Chudacoff's privileges based on patient safety, and the Fair Hearing Plan's protections of notice and an opportunity to be heard followed promptly. Furthermore, we note that in this case, the Fair Hearing Plan provided Plaintiff with review that ultimately resulted in the reversal of the suspension of his privileges.

licenses of other doctors and presents the strong potential for conflicts of interest." *Id.* at 1006-07. The Ninth Circuit found that the risk that board members may act out of their self interest is diminished because of the presence of three non-physicians on the Board. *Id.* at 1007.

In the case of the MEC, there is likewise the risk of "self interest economic regulation" because the members of the MEC are practicing in the same medical community as Plaintiff. *Id.* at 1007 (quoting *Watts v. Burkhart*, 978 F.2d 269, 276 (6th Cir. 1992) (en banc)). The MEC is composed of the present Chief of Staff, the past Chief of Staff, the Vice Chief of Staff, the Secretary, the Chief of each department, and four members at-large of the active staff. (Bylaws, Ex. 4 at 36 (#432-1).) Two of the members at-large are elected in even-numbered years and two in odd-numbered years for a term of two years. (*Id.*) All voting members are therefore part of Plaintiff's medical community, unlike in *Mishler*, where three of the six members were non-physicians. *See Mishler*, 191 F.3d at 1007. The Ninth Circuit notes, however, that in *Watts* the medical board was composed entirely of physicians, and the Sixth Circuit nevertheless found that the risk of self interest economic regulation is not enough to deny absolute immunity. *Id.* (citing *Watts*, 978 F.2d at 276). Compared to a state medical board, the members of the MEC work together in a much smaller community and may be susceptible to a greater risk of being tempted by personal gain when another physician's medical privileges are suspended. The Sixth Circuit found, however, that professionals in a local community may benefit from "professional courtesy" being at risk if physicians were to make selfish decisions regarding the privileges and licenses of other physicians in their community. *Watts*, 978 F.2d at 276-77. This factor leans against granting absolute immunity because of the possibility of decisions motivated by self interest. The addition of non-physicians or outside physicians to the MEC, or a more independent fair hearing committee, may alleviate the problems of political influence. However, we do not think that this factor, taken alone, is fatal to the question of absolute immunity.[3] The risk of self interest exists, but

---

[3] The finding that an official is not insulated from political influence is not by itself fatal to finding absolute immunity. *See, e.g., Miller v. Davis*, 521 F.3d 1142, 1145 (9th Cir. 2008). In *Miller*, the Ninth Circuit found that the governor is entitled to absolute immunity when reviewing parole decisions, despite being "by definition as an elected official, not insulated from

we cannot ignore the public interest and benefit in protecting those who report, investigate, and adjudicate conduct that may be harmful to patients and other employees at a hospital simply because the physicians who are in a position to report and investigate such conduct work in the same field and thus may be potential competitors.  Finally, the Fair Hearing Plan allows a physician to appeal to the Board of Hospital Trustees as a final appellate measure, and the members of the Board of Trustees are not required to be physicians in competition with the Plaintiff.  For that reason, we find that this factor does not require denial of absolute immunity.

### 4. Precedent

This factor "points in neither direction," because it is unclear whether the MEC relies on precedent when they exercise their authority.  *Buckwalter*, 678 F.3d at 744.

### 5. Adversariness

In *Moore*, the Tenth Circuit found that this factor is strictly against absolute immunity because the summary suspension process is completely non-adversarial. 310 F.3d at 1318. The existence of adversarial post-deprivation hearings was insufficient because the physician was "adversely affected by the summary suspension" and because, as in our case, no process is available following the issuance of written admonitions.  *Id.*  The Ninth Circuit, however, found that "[s]ummary suspensions are effectively adversary because they are subject to mandatory postdeprivation review."  *Buckwalter*, 678 F.3d at 743.  Furthermore, the Ninth Circuit found that routine disciplinary actions are adversary in nature because a physician is granted notice and an opportunity to be heard once the Nevada Board decides to proceed with disciplinary action.  *Mishler*, 191 F.3d at 1007.  In our case, the Bylaws provide that a summary suspension is effective for only thirty days or until the next regularly scheduled MEC meeting, and a practitioner is entitled to the rights contained in the Fair Hearing Plan.  (Bylaws, Ex. 4 at 37 (#432-1).)  Routine administrative actions similarly provide a physician with notice and

---

political influence."  *Id.*  The Ninth Circuit even noted that those decisions themselves "amply demonstrate" that the governor is influenced by politics, because of his "almost uniform denials of parole."  *Id.*  In our case, as we noted, there are alleviating factors such as extensive procedural safeguards built into the review process, and the pressure of professional courtesy which likely curtails selfish behavior.

an opportunity to be heard once the MEC has conducted its investigation and recommended a disciplinary action.[4]   For that reason, we find that the Bylaws provide for an adversarial process in the case of both summary suspensions and routine administrative actions.

### 6. Correctability

In *Moore*, the Tenth Circuit concludes that because an internal appellate process is unavailable for a letter of admonition, the sixth factor is against absolute immunity.  310 F.3d at 1318.  Despite noting that the bylaws "provide a full range of procedural protections" it finds that those protections are insufficient because they are unavailable if a summary suspension has been terminated by the staff.  *Id.*  It concludes that the right to file a lawsuit is inadequate as a right of appeal because it suggests that the committee should be granted immunity from suit since its procedures do not allow internal appeal but allow the committee to be sued.  *Id.* at 1318-19.

The Ninth Circuit, on the other hand, disagrees.  It found that the last *Butz* factor, correctability of errors on appeal, favors absolute immunity because "an erroneous summary suspension may be corrected in either the postdeprivation hearing or in Nevada state court in a subsequent appeal."  *Buckwalter*, 678 F.3d at 744.  We agree, as we must, with the Ninth Circuit.  Granting absolute immunity to the MEC against section 1983 suits seeking damages does not mean that a practitioner is denied the right of appeal to overturn an erroneous decision.

### 7. Conclusion

Taken as a whole, the *Butz* factors favor granting absolute immunity in this case due to insufficient procedural safeguards in the summary suspension process and disciplinary process.  For that reason, the requests that we dismiss the 1983 claims on the basis of absolute immunity must be granted.  Plaintiff has not made a showing of bad faith or malice, and all defendants are entitled to absolute immunity for their actions in prosecuting and

---

[4] While an adversary procedure is not available after the issuance of a reprimand letter, which ultimately occurred in our case after the suspension of privileges was revoked, a reprimand letter may not require the same procedural safeguards as the actual reduction or suspension of one's privileges.

1    adjudicating the charges against Plaintiff.

2    **MEDICAL AND DENTAL STAFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON**

3    **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (#409)**

4         The Medical and Dental Staff requests summary judgment on Plaintiff's claim for breach

5    of the implied covenant of good faith and fair dealing.  Plaintiff's breach of the implied covenant

6    of good faith and fair dealing claim is based upon the contract allegedly created as a result of

7    UMC's Bylaws and Credentialing Manual.  The Medical and Dental Staff argues that even if

8    the Bylaws and Credentialing Manual created a contract between UMC and Plaintiff, the

9    Medical and Dental Staff is not a party to that alleged contract.

10        Whether a contract exists between the parties is a question of fact.  *Whitemaine v.*

11   *Aniskovich*, 183 P.3d 137, 141 (Nev. 2008).  The Bylaws provide that the physicians practicing

12   at UMC hereby organize themselves into a Medical and Dental Staff in conformity with these

13   Bylaws, Rules and Regulations, and the Bylaws, policies, rules and regulations of UMC.

14   (Bylaws at 6, Ex. A (#409).)   The Bylaws enumerate the responsibilities, obligations, and

15   membership qualification requirements for Medical and Dental Staff.  (Bylaws, Article II-III, Ex.

16   A (#409).)  Article V delineates the practice privileges of Medical and Dental Staff members,

17   and Article X provides the purpose, composition, and functions of the MEC.  (*Id.*)  The Bylaws

18   also provide that routine administrative actions may be taken  for instances of unprofessional

19   conduct, acts, statements or demeanor likely to be detrimental to patient safety or to the

20   delivery of quality patient care.  (*Id.*)   The Bylaws provide that the procedure for routine

21   administrative actions is contained in the Credentialing Procedures Manual.  (*Id.*)  The Bylaws

22   further provide that the Chief of Staff has the authority to summarily suspend clinical privileges

23   when immediate action must be taken to protect the life of any patients or to reduce the

24   substantial likelihood of injury or damage to the health or safety of any patient, employee or

25   other person in the hospital.  (Bylaws, Article XI, Ex. A (#409).)

26        On February 21, 2007, Plaintiff signed a Consent and Statement of Applicant form that

27   provides in part that Plaintiff is "responsible for knowing the contents of the bylaws, rules and

28   regulations, and any supplemental manuals or policies and procedures UMC and the medical

25

1   staff [sic] and agree to be bound by them." (Consent Form, Ex. 1 at 45 (#432-1).)

2          Under Nevada law, an enforceable contract is formed when there is offer, acceptance,
3   meeting of the minds, and consideration.  *Mack v. Estate of Mack*, 206 P.3d 98, 108 (Nev.
4   2009).  In *Williams v. University Medical Center of Southern Nevada*, this Court predicted that
5   Nevada would find that a hospital's bylaws can create "an enforceable contract between the
6   hospital and its staff, as well as between the staff and its members."  *Williams v. Univ. Med.*
7   *Ctr. of So. Nevada*, 688 F. Supp. 2d 1134, 1141-42 (D. Nev. 2010).  The Court acknowledged
8   that a split in authority exists among other courts which have addressed the issue, but found
9   that a physician makes an offer to become a member of the hospital staff by applying for
10  privileges at the hospital, and the hospital and staff accept the offer by granting the physician
11  privileges.  *Id.* at 1142.  In doing so, the parties agree that the terms of the bylaws will govern
12  their relationship.  *Id.* The Court found that an unincorporated association's bylaws also
13  constitutes a contract between the members in their relation to the association.  *Id.* at 1143.
14  The Court also noted that a reasonable jury may find that a physician is an intended third party
15  beneficiary of the contract between the Chief of Staff and the hospital.  *Id.*  at 1144.  Based on
16  the reasoning in *Williams*, we decline to grant summary judgment on this issue.

17  **UMC AND BOARD OF TRUSTEE'S MOTION FOR SUMMARY JUDGMENT (##414, 417)**

18         UMC and the Board request judgment as a matter of law on Plaintiff's claim for breach
19  of the implied covenant of good faith and fair dealing on the basis that neither UMC nor the
20  Board participated in any of the events, or committed any of the acts, that Plaintiff has alleged
21  were breaches causing him injury.

22         Plaintiff's fifth amended complaint (#494) was filed after UMC and the Board filed this
23  motion for summary judgment (#414); however, the fifth amended complaint (#494) includes
24  identical claims.  The Court shall consider this motion (#414) as it applies to the current
25  operative complaint without requiring the parties to re-file motions that remain material and
26  relevant despite the filing of the amended complaint.

27         In our Order (#456) granting leave to file a fifth amended complaint, the Court allowed
28  Plaintiff to file claims for both tortious and contractual breach of the implied covenant of good

26

faith and fair dealing.  The Court had ruled that Plaintiff's previous complaints included a claim for breach of the implied covenant of good faith and fair dealing sounding in tort, after considering the type of damages Plaintiff was seeking.  Therefore, the fifth amended complaint contains two separate claims, but the allegations therein are identical and may still be fairly considered under the motion for summary judgment. (#414).  In fact, Plaintiff's opposition (#456) to the motion for summary judgment (#414) considers the motion in conjunction with the proposed fifth amended complaint, and Plaintiff notes that both claims contain similar prima facie cases and the only difference is the type of damages available for the breach. To the extent that Defendants focused their efforts on disposing of the tortious claim, the Court shall grant Defendants additional opportunity to respond to the newly-added contractual claim.

The fifth amended complaint (#494) pleads a claim of breach of the implied covenant of good faith and fair dealing against the Trustees, UMC, and/or the Medical Staff, alleging that Defendants breached the spirit of the Bylaws when Plaintiff's clinical privileges were suspended and/or limited without adequate notice or opportunity to be heard.  Plaintiff further alleges that Defendants failed to follow the Bylaws by not promptly scheduling or conducting a Fair Hearing despite numerous requests by Plaintiff.

To succeed on a claim for breach of the covenant of good faith and fair dealing, Plaintiff must show: "(1) the plaintiff and defendant were parties to an agreement; (2) the defendant owed a duty of good faith to the plaintiff; (3) the defendant breached that duty by performing in a manner that was unfaithful to the purpose of the contract; and (4) the plaintiff's justified expectations were denied." *Parker v. Bank of America, N.A.*, No. 3:12-cv-126-RCJ-VPC, 2012 WL 5944882, at *6 (D. Nev. Nov. 26, 2012) (citing *Perry v. Jordan*, 900 P.2d 335, 338 (Nev. 1995)).

UMC and the Board of Trustees argue that they were not involved in the actions alleged to be a violation of the covenant of good faith and fair dealing. Specifically, UMC disclaims involvement in the disciplinary process, and the Board points out that it conducted appellate hearings in which it reinstated Plaintiff's privileges.  UMC and the Board did not participate in the original MEC decision to suspend Plaintiff's privileges, and did not participate in the Fair

27

Hearing process.  The Clark County Board of Commissioners acts as the Board of Trustees for the limited purpose of providing appellate review of the actions of the MEC and the Fair Hearing Committee under a clearly erroneous standard.

Plaintiff argues that UMC and the Board have respondeat superior responsibility for the MEC's actions.  Specifically, Plaintiff suggests that UMC and the Board have a principal-agent relationship with the MEC and therefore are responsible for the actions of the MEC.  Because the motion predates the fifth amended complaint which includes an additional cause of action for breach of the implied covenant of good faith and fair dealing, the Court shall deny the motion at this time and allow UMC and the Board to file a renewed motion for summary judgment addressing the causes of action contained in the fifth amended complaint.

**Ellerton, Bernstein, Carrison, Roberts, and the Medical and Dental Staff's Motion for Partial Summary Judgment on Punitive Damages (#410)**

Defendants Ellerton, Bernstein, Carrison, Roberts, and the Medical and Dental Staff request summary judgment on the punitive damages claims.  Plaintiff seeks punitive damages for the section 1983 claim and for breach of the implied covenant of good faith and fair dealing. Because we grant absolute immunity to Defendants against section 1983 claims, we consider only the request for punitive damages for breach of the implied covenant of good faith and fair dealing.

The parties briefed this issue before the filing of the fifth amended complaint.  Because the inclusion of contractual and tortious breach of the covenant of good faith and fair dealing claims in the fifth amended complaint impacts the arguments contained in these briefs, the motion shall be denied in part with respect to the breach of implied covenant of good faith and fair dealing and the parties shall be advised to re-file a motion confronting the issues as currently presented.

### MOTION FOR ATTORNEY'S FEES (#509)

On June 15, 2011, the Court entered an Order (#257) approving a stipulation in which the parties agreed that Defendants would notify the NPDB to void any and all entries related to or involving Plaintiff filed by UMC between the period of May 27, 2008 through June 15,

2011 by June 17, 2011.  In a motion requesting sanctions (#356), Plaintiff claimed that after having difficulty finding employment, he discovered that the initial report was never voided from the NPDB system through a self query.   While Defendants acted immediately after the stipulated Court Order (#257), Defendants mistakenly voided only the revised report, which had been issued a new and separate number, and left the original report intact. The Court found that the failure to remove the remaining NPDB report was not a wilful violation of the stipulated Court Order (#257), but that Plaintiff had shown, and Defendants do not dispute, that Defendants had in fact failed to comply with the Order (#257).   The Court rejected (#493) Plaintiff's request that he be awarded sanctions in the amount of $1,000 per day since June 15, 2011 on the basis of the evidence presented, but awarded Plaintiff fees associated with bringing the Motion for Sanctions (#356).

Plaintiff again requests that the Court grant sanctions in the amount of all alleged lost earnings Plaintiff suffered due to Defendants' failure to remove the NPDB report.   The arguments presented in favor of that issue essentially request that the Court find that Defendants are in violation of section 1983 and liable for compensatory as well as emotional damages, and the request for such damages shall be denied as premature.

Plaintiff seeks $9,500.00 in attorney's fees associated with prevailing on the Motion for Sanctions (#356).  Pursuant to Local Rule 54–16, a motion for attorneys' fees must include a reasonable itemization and description of the work performed, an itemization of all the costs sought, and a brief summary of: (A) the results obtained and the amount involved, (B) the time and labor required, (C) the novelty and difficulty of the questions involved, (D) the skill and requisite to perform the legal service property, (E) preclusion of other employment by the attorney due to the acceptance of the case, (F) the customary fee, (G) whether the fee is fixed or contingent, (H) the time limitations imposed by the client or the circumstances, (I) the experience, reputation, and ability of the attorney(s), (J) the undesirability of the case, if any, (K) the nature and length of the professional relationship with the client, and (L) awards in similar cases. Nev. Loc. R. 54–16(b)(1), (2), (3)(A)-(L).

The local rule also requires that each motion "must be accompanied by an affidavit from

the attorney responsible for the billings in the case authenticating the information contained in the motion and confirming that the bill has been reviewed and edited and that the fees and costs charged are reasonable." Nev. Loc. R. 54–16(c). The "[f]ailure to provide the information required by LR 54–16(b) and (c) in a motion for attorneys' fees constitutes a consent to the denial of the motion." Nev. Loc. R. 54–16(d).

Plaintiff's counsel, Mr. Hafter, submitted a declaration in which he stated that the firm spent 23.75 hours related to briefing the Motion for Sanctions (#356) and the Motion for Fees (#509).  Plaintiff asks $400 per hour for Mr. Hafter's time based on Mr. Hafter's qualifications, experience in the field, and the results obtained.  Plaintiff cites Mr. Hafter's experience in the health care field both as a paramedic and as a field provider before going to law school, a Master of Science degree in Health Sciences, his $8.8 million jury verdict in a similar case, and the declaration of Robert Meals, Esq. (#278-1) who declares that due to the complex subject matter, an award of $450 per hour, more than the request $400, would be reasonable and appropriate.  That affidavit was provided in support of a request for attorney's fees for the appeal in this case, in which Mr. Hafter sought and was granted an award using a rate of $450 per hour.  Mr. Hafter provided an itemization of the hours spent on these motions, including time corresponding with Plaintiff regarding Plaintiff's self-query of the NPDB, preparing and filing the motions and replies, and working with Plaintiff to collect information regarding any financial losses allegedly attributable to Defendants' failure to clear the NPDB report.

There is no dispute that this case involves specialized issues involving a physician's rights when privileges are curtailed or suspended.  Mr. Hafter has demonstrated in this case, and in *Williams v. UMC*, that he is knowledgeable in the field and zealous on behalf of his clients.  Defendants contend that Plaintiff is attributing work done on other motions to the Motion for Sanctions (#356). We disagree. Plaintiff did include in his itemization hours w orked on "motion for order to show cause."  Based on the dates and the description of that work, it is clear that Plaintiff is referring to the appropriate motions and not seeking to receive fees for hours worked on separate matters. Defendants also contend that an hourly rate of $400 is not customary in Nevada.  As support, Defendants provide an affidavit from Kim Mandelbaum,

30

Esq. stating that Defendants' primary attorney has been practicing in Nevada for over 24 years and almost exclusively in this area of law and is being paid $150 per hour.  Defendants also contend that Plaintiff's former counsel represented previously that his billable rate was $165 per hour.

While the Court finds that Plaintiff's counsel did not mis-attribute work done on other matters in claiming 23.75 hours' worth of work, the Court finds that the $400 billable rate is not reasonable here.  The fees sought here are specifically related to Defendants' failure to remove NPDB reports, and do not involve the highly specialized expertise Mr. Hafter claims entitles him to an hourly rate of $400.  While the Court previously ordered that fees shall be awarded as it was Defendants' mistake that prompted the work involved in bringing the Motion for Sanctions (#356) and the Motion for Attorney's Fees (#509), the fees were not awarded as a sanction against any type of intentional or wilful misbehavior.  The fees are meant to compensate Plaintiff for additional legal fees that were incurred as a result of Defendants' failure to remove the NPDB report. In addition, we note that there is some dispute over whether Plaintiff might have avoided fees altogether simply by working with Defendants and alerting them to the remaining report, rather than filing motions with the Court.  For that reason, the Court shall reduce Plaintiff's requested hourly billing rate to $300, still well above the rates that Defendants claim is customary in the area.  Attorney's fees shall, therefore, be awarded in the amount of $7,125.00.

**CONCLUSION**

For the foregoing reasons, IT IS ORDERED that the Motion for Partial Summary Judgment on Plaintiff's Breach of the Implied Covenant of Good Faith and Fair Dealing claim against Defendant The Medical and Dental Staff (#409) is **DENIED**.

IT IS FURTHER ORDERED that the Motion for Partial Summary Judgment on Plaintiff's Punitive Damages Claim (#410) is **GRANTED** with respect to punitive damages under section 1983 and **DENIED** with respect to punitive damages for breach of the covenant of good faith and fair dealing.  Plaintiff's Request for Order Allowing the Filing of an Overlength Brief (#446) is **GRANTED**.  Plaintiff's Request to Strike Exhibits (#468) is **DENIED** as the Court has

previously ruled that the exhibits are not new evidence.

IT IS FURTHER ORDERED that the Motions for Summary Judgment (##414, 417) are **DENIED**.  Plaintiff's Request for Order Allowing the Filing of an Overlength Brief (#457) is **GRANTED**.

IT IS FURTHER ORDERED that the Motion for Summary Judgment (#478) is **GRANTED**.  Plaintiff's claims under section 1983 are dismissed.

IT IS FURTHER ORDERED that the Motion for Attorney's Fees (#509) is **GRANTED IN PART AND DENIED IN PART**.  Plaintiff shall be awarded $7,125.00 in fees.

IT IS FURTHER ORDERED that the Motions to Dismiss (##510, 545) are **GRANTED** with respect to any claims under section 1983 and **DENIED** with respect to any remaining claims.  Plaintiff's Motion For Leave to File Excess Pages (#559) is **GRANTED**.

The parties may file additional motions in accordance with this Order within twenty-eight (28) days.

Dated this 21st day of June, 2013.

_____
United States District Judge